UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BIRMINGHAM RETIREMENT AND RELIEF
SYSTEM, Individually and on Behalf of All
Others Similarly Situated,

       Plaintiffs,

    - against -

S.A.C. CAPITAL ADVISORS, LLC, S.A.C.
CAPITAL ASSOCIATES, LLC, S.A.C.
INTERNATIONAL EQUITIES, LLC, S.A.C
SELECT FUND, LLC, CR INTRINSIC
INVESTORS, LLC, STEVEN A. COHEN,
MATHEW MARTOMA, CR INTRINSIC
INVESTMENTS, LLC and SIDNEY GILMAN,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Case No.

**13 CV 2459**

**JURY TRIAL DEMANDED**

**ECF CASE**



**CLASS ACTION COMPLAINT**

Plaintiff Birmingham Retirement and Relief System ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Class Action Complaint against defendants CR Intrinsic Investors, LLC ("CR Intrinsic"), Mathew Martoma ("Martoma"), Dr. Sidney Gilman ("Gilman"), Steven A. Cohen ("Cohen"), CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC ("SAC Capital Advisors"), S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, and S.A.C. Select Fund, LLC (collectively, "Defendants"), allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of Court filings in related actions, media reports, filings with the Securities and Exchange Commission ("SEC"), trading records, press releases, and other publicly-available information.

## NATURE OF THE ACTION

1.      This is a securities class action arising from the most profitable insider trading conspiracy ever uncovered.  Through unlawful use of material, nonpublic information, Defendants profited, or avoided losses, of over $276 million, including $56 million from trades in the stock of Wyeth (formerly NYSE: WYE).

2.      This action is brought on behalf of all investors who purchased or otherwise acquired Wyeth common stock, contemporaneously with Defendants' unlawful trades, from July 21, 2008 through and including July 29, 2008 (the "Class Period"), pursuant to Sections 10(b), 20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b),78t-1 and 78t(a), and Rule 10b-5, promulgated thereunder (17 C.F.R. §240.10b-5).

3.      The conspiracy set forth herein is the subject of a pending criminal prosecution, *United States v. Martoma*, No. 12-mj-2985 (the "Criminal Action"), and an SEC enforcement action,

*SEC v. CR Intrinsic Investors, LLC*, No. 12-cv-8466 (the "SEC Action"), both filed in this District in November 2012.

4.      As described in the complaints in these actions (respectively, the "Criminal Complaint," "SEC Complaint," and "SEC Amended Complaint"), defendant SAC Capital Advisors, together with its affiliates (collectively "SAC Capital"), illegally traded Wyeth common stock based on material nonpublic information ahead of a July 29, 2008 announcement (the "July 29 Announcement") disclosing disappointing clinical trial results for the drug bapineuzumab (AAB-001) ("bapi"). Bapi is an Alzheimer's disease treatment that was being jointly developed by Wyeth and Elan Corporation, plc ("Elan").

5.      Bapi was recognized by investors as material to Wyeth's future and the July 29 Announcement, made after the close of the market, drove a nearly 12% decline in the value of Wyeth, from $45.11 (the closing price on the day of the announcement) to $39.74 (the closing price the day after the announcement).

6.      Prior to the July 29 Announcement, the negative clinical trial results (the "Inside Information") had been secretly disclosed to a CR Intrinsic portfolio manager, Defendant Martoma, by Defendant Gilman, the doctor who chaired the Safety Monitoring Committee (the "SMC") overseeing the clinical trial and who was selected by Wyeth and Elan to present the final clinical trial results at a July 29, 2008 conference. Martoma is the defendant in the Criminal Action and is also a defendant in the SEC Action. In November 2012, Gilman entered into a nonprosecution agreement with the U.S. Department of Justice ("DOJ"), which required him to serve as a cooperating witness, and he consented to a judgment against him in the SEC Action requiring him to disgorge over $200,000, representing the profits from his unlawful conduct.

7.    As detailed below, Martoma discussed bapi with Gilman numerous times between 2006 and June 2008.  Gilman was paid approximately $1,000 per hour.  Starting in at least 2007, Gilman began providing Martoma with material nonpublic information concerning the ongoing bapi clinical trials.  Throughout 2007 and up to July 2008, CR Intrinsic and SAC Capital established substantial long positions in Wyeth and Elan securities.  As of June 30, 2008, the CR Intrinsic portfolios owned over $233 million worth of Elan securities and over $80 million of Wyeth stock.  The combined holdings in Elan and Wyeth securities represented approximately 14% of the CR Intrinsic portfolios' entire equity position at that time. Similarly, as of June 30, 2008, the SAC Capital portfolios owned over $293 million of Wyeth stock and over $95 million of Elan securities, which represented over 4% of the SAC Capital portfolios' entire equity position at that time.

8.    SAC Capital's trades were directly supervised by Defendant Cohen, its founder, Chief Executive Officer and Chief Investment Officer, and Cohen based his approval of the trades on his direct communications with Martoma.

9.    Cohen approved SAC Capital's acquisition and retention of its massive position in Elan and Wyeth over the objections of other, more experienced fund managers, despite Martoma's junior position and lack of track record.  Martoma had joined SAC Capital in 2006, shortly before his consultations with Gilman began and SAC Capital opened its position in Wyeth and Elan.  When he was later terminated in 2010, an officer of the Fund described him as a "one trick pony with Elan."

10.    Martoma was directly employed by CR Intrinsic, a subsidiary of SAC Capital. According to news reports, CR Intrinsic was long considered the "crown jewel" of SAC Capital,

and in 2008, Cohen had much of his personal net worth, estimated at $8.8 billion, invested with CR Intrinsic.

11.    On June 17, 2008, Wyeth and Elan released top-line (summary) results from the Phase II clinical trial of bapi (the "June 17 Announcement"). The market's reaction was generally favorable. After the June 17 Announcement, the price of Wyeth common stock rose 4% and the price of Elan ADRs rose 10.7%. Martoma reaffirmed his positive outlook on Elan after the June 17 Announcement, predicting that "I think stock breaks $40" after detailed trial results were to be released six weeks later.

12.    According to the SEC Amended Complaint, Gilman learned in late June 2008 that he would be presenting the results of the bapi clinical trials at the International Conference on Alzheimer's Disease ("ICAD"), a widely-anticipated event to be held on July 29, 2008. In the weeks before ICAD, Gilman learned the complete safety and efficacy results for the trials. For example, Gilman traveled by private plane to Elan's offices for meetings on July 15 and 16, 2008, so that he could learn the full results of the Phase II Trial.

13.    The results were unexpectedly and significantly negative.

14.    On Thursday, July 17, 2008, Gilman briefed Martoma in detail and provided him an encrypted presentation of the full trial results.

15.    On the morning of Sunday, July 20, 2008, Martoma emailed Cohen that he would like to speak with him and that "[i]t's important." Thereafter, they spoke for nearly 20 minutes.

16.    While *no new public information had been disclosed regarding bapi since the June 17 Announcement*, and only three weeks had passed since Martoma's bullish statements regarding Elan's target price, SAC Capital's head trader, identified in news reports as Phillipp Villhauer ("Villhauer"), began aggressively selling the Fund's positions in both Elan and Wyeth

the following day. Over the seven trading days leading up to the July 29 Announcement, SAC Capital liquidated its positions in Elan and Wyeth, worth $365 million and $335 million, respectively.

17.     In addition, SAC Capital opened large short positions in both Elan and Wyeth.

18.     Villhauer's emails reflect that he actively concealed the sales from both the market and others at SAC Capital, excepting Cohen and Martoma. On July 21, he emailed Martoma regarding the sales, stating that "obviously no one knows except me[,] you and [Cohen]." Villhauer later reported to Cohen that "[w]e executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC Capital Advisors] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

19.     In addition, between July 21, 2008 and July 29, 2008, the CR Intrinsic and SAC Capital portfolios sold over 10.4 million shares of Wyeth for gross proceeds of over $460 million, including over 6.1 million Wyeth shares worth over $270 million during the very day of the July 29 Announcement. As a result of these sales, the CR Intrinsic and SAC Capital portfolios had a zero balance in Wyeth stock during the trading day on July 29,2008, but continued to place short sales that day. By the close of the market on July 29, 2008, the CR Intrinsic and SAC Capital portfolios had a combined short position of approximately 3.3 million Wyeth shares. The trading by the CR Intrinsic and SAC Capital portfolios in Wyeth securities constituted over 11% of the reported trading volume in the seven days prior to the July 29 Announcement.

20.     In total, by causing SAC Capital to liquidate its long position in Elan and Wyeth during the week before the July 29 Announcement, Cohen, Martoma and Villhauer permitted

SAC Capital to avoid $194 million in losses, and secure a $75 million profit from the short

positions that they opened during the same week, after the Inside Information became public

knowledge as a result of the July 29 Announcement.

21.     Martoma received a $9.3 million bonus for 2008, a significant portion of which

was attributable to the illegal profits that SAC Capital had generated in the Elan and Wyeth short

sales in late July.  His success as a portfolio manager was, however, short-lived, as he was

terminated by SAC Capital in 2010.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b), 20A and 20(a) of the

Exchange Act, 15 U.S.C. §§78j, 78t-1 and 78t(a), and this Court therefore has jurisdiction over

the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the

Exchange Act, 15 U.S.C. §78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. §78aa, and 28 U.S.C. §1391(b).  During the Class Period, Wyeth common stock and Elan

ADRs traded on the New York Stock Exchange ("NYSE"), which is located in this District.  In

addition, the expert firm that facilitated communications between Martoma and Gilman is based

in this District and SAC Capital maintains an office in this District at 510 Madison Avenue, New

York, New York.  According to the SEC Complaint, Martoma and Gilman used SAC Capital's

Manhattan office in furtherance of the fraudulent scheme set forth herein.

24.     In connection with the challenged conduct, Defendants, directly or indirectly,

used the means and instrumentalities of interstate commerce, including, but not limited to, the

United States mails, interstate telephone communications and the facilities of the national

securities markets.

## PARTIES

### A.      Plaintiff

25.     Plaintiff Birmingham Retirement and Relief System purchased Wyeth Stock during the Class Period, as set forth in its accompanying certification, contemporaneously with the sales by SAC Capital (the "SAC Insider Sales"), and was damaged when the Inside Information was publicly disclosed at the end of the Class Period and the price of Wyeth common stock declined as a result.

### B.      Defendants

26.     CR Intrinsic is an unregistered investment adviser located in Stamford, Connecticut and an affiliate of SAC Capital Advisors.

27.     CR Intrinsic Investments, LLC is a hedge fund affiliated with CR Intrinsic that benefitted from the illegal insider trades in Elan and Wyeth securities alleged herein.

28.     SAC Capital Advisors is an investment adviser located in Stamford, Connecticut that managed certain affiliated hedge funds that benefitted from the illegal insider trades in Elan and Wyeth securities.  SAC Capital Advisors also obtained increased fees as a result of the illicit gains from these trades.

29.     S.A.C. Capital Associates, LLC is a hedge fund that in July 2008 was affiliated with SAC Capital Advisors and that benefitted from the illegal insider trades in Elan and Wyeth securities alleged herein.

30.     S.A.C. International Equities, LLC is a hedge fund that in July 2008 was affiliated with SAC Capital Advisors and that benefitted from the illegal insider trades in Elan and Wyeth securities alleged herein.

31.     S.A.C. Select Fund, LLC is a hedge fund that in July 2008 was affiliated with SAC Capital Advisors and that benefitted from the illegal insider trades in Elan and Wyeth securities alleged herein.

32.     Defendant Cohen is a Connecticut resident and the founder, Chief Executive Office and Chief Investment Officer of SAC Capital, which began operations in 1992.  Cohen is identified as "Portfolio Manager A" in the SEC Complaint and as the "Hedge Fund Owner" in the Criminal Complaint.  He is also the owner and founder of SAC Capital and CR Intrinsic.

33.     Defendant Martoma is a Florida resident who was employed by CR Intrinsic between 2006 and 2010 as a portfolio manager or analyst.  Martoma is named as the defendant in the Criminal Complaint and is also named in the SEC Complaint and Amended Complaint.

34.     Defendant Gilman is a Michigan resident and, until his resignation on or about November 27, 2012, was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan Medical School.  Gilman is identified in the Criminal Complaint as the "Cooperating Witness" or "CW" and is named as a defendant in the SEC Complaint and Amended Complaint.  Gilman served as a consultant to Elan and Wyeth from 2003 until 2009, when Elan sold its interest in certain drugs to Jannsen/Pfizer.

35.     Defendants Cohen, SAC Capital Advisors, and CR Intrinsic are referred to herein as the "Control Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.      Background Regarding Elan, Wyeth, and Bapineuzumab

36.     Elan is an Irish public limited company with its principal executive offices in Dublin, Ireland.  Elan's principal research and development facilities are located in the United States.

37.     Elan was incorporated as a private limited company in Ireland in December 1969 and became a public limited company in January 1984.  It has reported with the SEC as a foreign issuer since at least 1996.  Elan's Ordinary Shares trade on the Irish Stock Exchange and the London Stock Exchange, and its ADRs trade on the NYSE under the symbol "ELN."

38.     Wyeth was a pharmaceutical company incorporated in Delaware with its principal place of business in Madison, New Jersey.  Wyeth's securities were registered with the SEC pursuant to Section 12(b) of the Exchange Act and its stock traded on the NYSE under the symbol "WYE" until Wyeth was acquired by Pfizer in 2009.

39.     Elan and Wyeth jointly undertook research and clinical trials of bapi for the treatment of Alzheimer's disease.

40.     Clinical trials are divided into three phases involving progressively greater numbers of test subjects and are a central part of the process of new drug review and approval required by the U.S. Food and Drug Administration ("FDA").  In Phase I, a trial tests the drug on a small group of people (generally, 20-80) to determine its safety, determine a safe dosage range, and identify side-effects.  In Phase II, the drug is given to a larger group of people (generally, 200-300) to determine if it is effective and further evaluate its safety.  Finally, in Phase III, the drug is given to large groups of people to confirm its effectiveness, its safety, and to monitor any side-effects.

41.     In 2006, data from a Phase I study of bapineuzumab showed promise, and Elan and Wyeth initiated two Phase II studies.

42.     Between 2006 and 2008, Elan and Wyeth jointly conducted a Phase II clinical trial for bapi's treatment of Alzheimer's disease (the "Phase II Trial").  The Phase II Trial was

designed to assess the safety and tolerability of bapi in mild-to-moderate Alzheimer's disease, and to explore bapi's efficacy at a range of doses.

43.     Elan and Wyeth released top-line results of the Phase II Trial on June 17, 2008, and released the detailed final results of the trial in the July 29 Announcement. The market reacted positively to the June 17 Announcement; the day after the announcement, the stock prices of Elan and Wyeth rose more than 10% and 4%, respectively. However, following the June 17 Announcement, investors were immediately looking ahead to the expected release of the detailed results on July 29. As one analyst put it, the "[p]resentation of more complete data at [a scheduled conference on Alzheimer's disease] at the end of July will be a much anticipated event as investors should gain much greater insight into the drug's safety and efficacy profile as well as whether there may be the possibility for an accelerated registration strategy."

44.     Despite the market's positive reaction to the June 17 Announcement, the more detailed July 29 Announcement failed to meet the market's expectations and caused the price of Elan's ADRs to plummet approximately 42% and the price of Wyeth common stock to drop almost 12% by the end of the day following the announcement.

**B.**     **Background Regarding SAC Capital, CR Intrinsic, and Martoma**

45.     SAC Capital was founded by Defendant Cohen in 1992 and, according to the most recent published information, has over $16 billion in assets under management, making it among the largest 25 U.S. hedge funds.

46.     SAC Capital's investments cover a broad spectrum of international long/short equity, fixed income, statistical arbitrage, credit, commodities, and options.

47.     SAC Capital's investment strategy relies heavily on collecting market information. As explained in a 2010 Vanity Fair profile of Cohen – one of two interviews that

had then ever been granted by him – in the late 1990s, "Cohen became renowned in trading circles as a voracious gatherer of market information." According to a recent *New York Times* article, "Cohen and his staff are known for relentlessly digging for information about publicly traded companies to form a 'mosaic,' building a complete picture of the company's prospects that gives the firm an edge over other investors."

48.     Martoma joined SAC Capital in 2006, after working at a smaller hedge fund in Boston. He received his B.A. in biomedicine, ethics, and public policy from Duke University in 1995 and worked at the National Human Genome Research Institute after college. He later received an MBA from Stanford University.

49.     For 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain other SAC Capital portfolios.

50.     Martoma's success with Elan in 2008 contrasts sharply with his later performance at SAC Capital. Martoma received no bonus in 2009, and was fired in 2010. In a 2010 email suggesting that Martoma be fired, a SAC Capital officer commented that Martoma had been a "one trick pony with Elan."

C.     **Dr. Gilman and His Work on the Bapi Clinical Trials**

51.     Defendant Gilman is a leading neurologist and expert on Alzheimer's disease. Until he resigned in late November 2012 after the filing of the Criminal and SEC Complaints, he was the William J. Herdman Distinguished University Professor of Neurology at the University of Michigan. He was also the Director of the Michigan Alzheimer's Disease Research Center. Gilman authored or co-authored over 200 peer-reviewed papers, and has received numerous awards in his field.

52.     Gilman became affiliated with the Gerson Lehrman Group, Inc ("GLG"), a leading expert network firm, in 2002 and, according to news reports, was later introduced to Martoma through GLG in 2006.

53.     Gilman served as Chair of the Safety Monitoring Committee for bapi clinical trials starting in 2003 and continuing until at least 2011.  Gilman was paid approximately $79,000 by Elan for his work on the SMC in 2007 and 2008.

54.     By the time Gilman was introduced to Martoma, his ongoing relationship with Elan and Wyeth, and access to non-public safety data, were well-known publicly and known to Martoma.

55.     As Chair of the bapi SMC, Gilman had continuing access to material nonpublic information concerning the Phase II trials of bapi.  In addition, Gilman agreed to present the Phase II trial results on behalf of Elan and Wyeth at ICAD, a widely-anticipated Alzheimer's disease conference scheduled to be held on July 29, 2008.  To perform this function, Gilman was given access to the full Phase II trial results approximately two weeks prior to the July 29 Announcement.  According to the SEC's Amended Complaint, Gilman served as a consultant to Elan and Wyeth from 2003 until 2009.

56.     By virtue of his role in the clinical trial, and in accordance with the terms of his contract with Elan, Gilman owed Elan and Wyeth a duty to hold in strict confidence all information he learned in connection with his participation in the clinical trial and to use such information only for the benefit of Wyeth and Elan.  According to the SEC Complaint, the consulting agreement between Elan and Gilman provided that "[a]ny and all information which Elan may disclose to Consultant under this Agreement will be considered confidential . . . ."  In addition, the SMC Operating Guidelines, to which Gilman was subject, provided that "strict

confidentiality will be maintained by all the SMC members in accordance with written agreement with" Elan.

57.     Gilman also received training on the prohibitions of the federal securities laws from GLG, the expert network firm that introduced him to Martoma, which repeatedly reminded Gilman not to share nonpublic information with clients.  Emails sent to Gilman by GLG also listed bapi as a topic that Gilman was "not allowed to discuss."

58.     Prior to its indictment of Martoma in November 2012, the DOJ entered into a nonprosecution agreement with Gilman in exchange for his cooperation, and he is identified in the Criminal Complaint as the "Cooperating Witness" or "CW."  Gilman is also a named defendant in the SEC Complaint and on November 16, 2012 consented to entry of a judgment against him, which provided for payment of disgorged profits and interest in the amount of $234,868, as well as an injunction against further violations of the securities laws.

### D.    Dr. Gilman Provides Nonpublic Information and CR Intrinsic and SAC Capital Start Accumulating Long Positions in Wyeth and Elan

59.     Martoma was introduced to Gilman through paid consultations arranged by GLG. Between 2006 and 2009, Gilman participated in 42 consultations with Martoma.

60.     Starting in 2006 or 2007, Gilman provided Martoma with material nonpublic information concerning the bapi Phase II trial.  As a member of the SMC, Gilman received periodic updates concerning safety data for the ongoing trial.  Among other communications, in advance of each SMC meeting, Gilman received a PowerPoint presentation that included dosage information and information concerning side-effects that patients in the Phase II trial were experiencing.

61.     Starting in 2006 or 2007, Gilman contacted Martoma after SMC meetings to report to Martoma what he had learned during the meetings.  During these calls, Gilman

discussed the PowerPoint presentations and provided Martoma with his perspective on the results. Gilman's consultations with Martoma frequently occurred on the same day or shortly after Gilman had attended an SMC meeting. Among other meetings, Gilman had consultations with Martoma on February 9, 2007 (the day following an SMC meeting), October 9, 2007 (less than three hours after an SMC meeting), and March 18, 2008 (hours after an SMC meeting).

62. Martoma and Gilman coordinated their expert network consultations around scheduled SMC meetings. For example, on August 23, 2007, Gilman advised Martoma that "[t]he SMC teleconference will be postponed until the following week. Should we postpone our planned teleconferences until a more definitive date [for the SMC teleconference] has been established?" When the SMC meeting was not rescheduled as expected, Gilman emailed Martoma on September 5, 2007 to report that the SMC meeting had still not been scheduled and noted to Martoma, "you may want to postpone [our scheduled conference call] until there is more to discuss." Gilman next consulted with Martoma through GLG on October 9, 2007 – hours after the next SMC meeting.

63. On at least one occasion prior to July 2008, Gilman emailed Martoma concerning specific nonpublic information regarding the Phase II trial that Gilman had obtained from a PowerPoint presentation. The email to Martoma, which Gilman labeled "For Your Eyes Only" and "High Priority," explicitly referenced the dropout rate for the bapi clinical trial and referred to how many patients took bapi during each round of the trial. The figures used in the email (including certain mathematical errors) were taken directly from a slide in the Elan-prepared PowerPoint presentation used at the March 18, 2008 SMC meeting.

64. Martoma and Gilman also took steps to conceal the true topic of their conversations from GLG. For example, when Martoma scheduled a consultation with Gilman

three hours after the March 18, 2008 SMC meeting, Martoma reported to GLG that the purpose

of the call was "Follow-up with Dr. Gilman: AAN Abstract Preview" even though Martoma and

Gilman had discussed the bapi Phase II trial during the consultation.  Later, in advance of a

consultation that Gilman's personal calendar noted was to discuss side-effects that the Phase II

trial was finding in patients taking bapi, Gilman emailed Martoma and asked him to set up a

consultation with GLG, suggesting that Martoma tell GLG that the consultation was to discuss a

drug to treat Parkinson's disease.

     65.     During the period of Martoma's consultations with Gilman, CR Intrinsic and SAC

Capital portfolios established very large long positions in Elan and Wyeth securities.  As of June

30, 2008, the CR Intrinsic portfolios owned over $233 million worth of Elan securities and over

$80 million of Wyeth stock.  The combined holdings in Elan and Wyeth securities represented

approximately 14% of the CR Intrinsic portfolios' entire equity position at that time.  Similarly,

as of June 30, 2008, the SAC Capital portfolios owned over $293 million of Wyeth stock and

over $95 million of Elan securities, which represented over 4% of the S.A.C. Capital portfolios'

entire equity position at that time.  Finally, in addition, the SAC Capital portfolios also held an

equity swap position with respect to 12 million shares of Wyeth stock.[1]

     66.     The Elan and Wyeth positions held by CR Intrinsic and SAC LP were held

primarily in portfolios controlled by Martoma and Cohen, respectively.  Martoma included Elan

and Wyeth as "long ideas" in his weekly portfolio updates circulated between January 1, 2008

and early July 2008 to Cohen, among others, and listed the release of the Phase II trial results as

an "[u]pcoming catalyst."

---

[1]     An equity swap is a transaction, typically entered into with a broker-dealer, where a party
receives cash flow based on the performance of the underlying equity for a specified period of time in
exchange for paying a premium to the broker-dealer.  Generally, a party will sell its equity position and
buy the economic interest on the shares it sold via an equity swap when it desires to free up cash.

67.     Martoma and Cohen maintained their bullish positions in Elan and Wyeth even though there was significant dissent within SAC Capital on the wisdom of doing so.  In March and April 2008, two analysts at CR Intrinsic repeatedly sent emails to Cohen advocating against the Elan and Wyeth positions and suggesting trading strategies designed to hedge them.

68.     For example, on March 26, 2008, one of these analysts sent Cohen an email with the subject line "ELN, (important, please read) negative reads from company and other buysiders" and listed several reasons why the analyst was concerned with the Elan position. Cohen forwarded the email to Martoma, who responded, "I read the message.  Nothing worrisome here.  Let me know when you are free to discuss in detail."  Martoma and Cohen made no changes to their holdings despite the analysts' concerns.  In fact, after the June 17 Announcement, Cohen indicated he would no longer consider any investment ideas in Elan or Wyeth from the two CR Intrinsic analysts who had previously raised their concerns.

69.     Elan and Wyeth released summary, top-line results of the Phase II trial on June 17, 2008.  The market reacted positively and the trading price of Elan ADRs and Wyeth stock rose more than 10% and 4%, respectively.

70.     Martoma maintained his positive outlook on Elan after the June 17 Announcement.  In a June 30, 2008 email, sent when Elan ADRs were trading at approximately $35, Martoma told Cohen that he intended to add further to the Elan position, saying, "I think stock breaks $40" following the announcement of full Phase II trial results, scheduled for one month later, on July 29.

71.     In late June 2008, Gilman learned that he likely would be selected to present the Phase II trial results at ICAD on July 29.  After finding out about his selection, Gilman sent an email to Martoma with the subject line "Some news" and told Martoma to "[p]lease set up [a

GLG] conversation re MS."  During this consultation – purportedly about Multiple Sclerosis – a disease treated by Elan's other principal drug, *Tysabri*, but with no connection to bapi – Gilman informed Martoma that he would be the presenter of the final clinical trial results at ICAD on July 29.

72.     After being named the presenter, Gilman arranged to travel to Elan's offices for meetings on July 15 and 16, 2008, so that he could learn the full results of the Phase II trial.

73.     Thereafter, in the weeks leading up to the July 29 Announcement, Gilman had several telephone calls with Martoma during which he provided Martoma with material nonpublic information regarding both the safety and efficacy results for the Phase II trial.  For example, on Friday, July 11, 2008, Gilman participated in an SMC meeting in which the safety results for the completed Phase II trial as a whole were discussed.  Two days later, on Sunday, July 13, Gilman spoke with Martoma for more than 1 hour and 40 minutes.  During this call, Gilman provided confidential information to Martoma concerning the completed Phase II trial safety results.  Gilman, in fact, explicitly noted in his electronic calendar that the purpose of this call with Martoma was to discuss "SAEs in hap" – referring to serious adverse effects, also known as side-effects, found in patients taking bapi.

74.     Towards the end of the July 13 call, Martoma and Gilman each created Outlook Calendar entries reflecting that they intended to speak again on July 17, 2008 – the day after Gilman returned from his scheduled meetings with Elan.

75.     On July 15, 2008, Gilman traveled to San Francisco in a private plane arranged by Elan to participate in two days of meetings concerning the Phase II trial efficacy results.  During these meetings, Gilman was briefed on the complete efficacy results of the trial, and also

reviewed and commented on a PowerPoint presentation that he would use to present the results at ICAD.

76.     On July 17, 2008, after Gilman returned to Ann Arbor, Michigan, an Elan executive sent Gilman an updated ICAD PowerPoint presentation in an email labeled "Confidential, Do Not Distribute." The 24-page PowerPoint included summaries of the detailed efficacy results and safety results for the Phase II trial as well as additional commentary on how Elan and Wyeth were interpreting the data.

77.     Later in the afternoon of July 17, 2008, Gilman and Martoma had another lengthy phone call during which Gilman provided Martoma with confidential information regarding the detailed results of the Phase II trial, including all the information contained in the PowerPoint presentation. At or about 3:00 p.m. on July 17, 2008, Martoma was picked up at SAC Capital's New York office for a one-way trip to his home in Greenwich, Connecticut. At 4:15 pm, Martoma called Gilman from his home phone and talked to Gilman for approximately 1 hour and 45 minutes.

78.     Shortly after this call, Gilman sent the PowerPoint presentation to Martoma. Martoma subsequently called Gilman to request the password needed to open the encrypted file, which Gilman provided.

79.     Gilman and Martoma continued to communicate after their July 17 conversation in the days leading up to the July 29 Announcement. In addition to three short calls on July 18, Martoma and Gilman had a 39-minute conversation on July 22, a 23-minute conversation on July 24, and a conversation approximately 11 minutes in length the day before the July 29 Announcement.

**E.**     **The Adverse Clinical Trial Results and Insider Trading**

80.     On the morning of Sunday, July 20, 2008, following his July 17 and 18 calls with Gilman, Martoma sought to speak with Cohen about the Elan positions that the CR Intrinsic and SAC Capital portfolios had amassed to that point, telling Cohen by email that "[i]t's important" that they speak.  Martoma and Cohen thereafter spoke for nearly 20 minutes.  Martoma indicated to Cohen that Martoma was no longer "comfortable" with the Elan investments held by the CR Intrinsic and SAC Capital portfolios.

81.     On Monday, July 21, 2008, Villhauer, Cohen's head trader, began selling Elan and Wyeth securities held in the CR Intrinsic and SAC Capital portfolios that Martoma and Cohen controlled.  Before the market opened on July 21, 2008, these portfolios held over 10.5 million Elan securities worth more than $365 million and over 7.1 million Wyeth shares worth more than $335 million, for a total position size of over $700 million.

82.     At Cohen's direction, the trades that Villhauer executed in Elan and Wyeth securities between July 21 and July 29, 2008 were kept confidential even within CR Intrinsic and SAC Capital.  This was confirmed in a July 21, 2008 email from Villhauer to Martoma concerning the sales: "obviously no one knows except me[,] you and [Cohen]."  Later, after Villhauer sold CR Intrinsic's and SAC Capital's portfolios' existing position in Elan, Villhauer reported to Cohen that "[w]e executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and SAC Capital] at an avg price of 34.21.  This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

83.     Martoma also urged Cohen and Villhauer to sell the Elan securities in the CR Intrinsic and SAC Capital portfolios quickly.  For example, on July 22, ten minutes after Villhauer called Martoma, Martoma sent Cohen an instant message at 1:22:34 p.m. saying,

"would do more today if possible[,]" suggesting that Cohen sell more Elan ADRs.  At 1:22:50 p.m., Cohen responded, in relevant part, "we are done on 2.3 today[.]" Martoma replied, "my sense is today-thurs are best days so if possible to do more, would do so[.]" After receiving Martoma's message, Cohen sold over an additional 2.2 million Elan ADRs on July 22.

84.     In total, between July 21, 2008 and July 29, 2008 (the last trading day before the post-market July 29 Announcement), the CR Intrinsic and SAC Capital portfolios sold over 15 million Elan securities for gross proceeds of over $500 million.  Although the investment advisers' portfolios achieved a zero balance in Elan securities by July 25, 2008, they continued to sell short Elan securities until the July 29 Announcement.  By the close of the market on July 29, 2008, the CR Intrinsic and SAC Captial portfolios had a combined short position of approximately 4.5 million Elan securities.  The trading by the CR Intrinsic and SAC Capital portfolios in Elan securities constituted over 20% of the reported trading volume in the seven days prior to the July 29 Announcement.

85.     In addition, between July 21, 2008 and July 29, 2008, the CR Intrinsic and SAC Capital portfolios sold over 10.4 million shares of Wyeth for gross proceeds of over $460 million, including over 6.1 million Wyeth shares worth over $270 million during the day of the July 29 Announcement.  As a result of these sales, the CR Intrinsic and SAC Capital portfolios had a zero balance in Wyeth stock during the trading day on July 29, 2008, but continued to place short sales of Wyeth stock that day.  By the close of the market on July 29, 2008, the CR Intrinsic and SAC Capital portfolios had a combined short position of approximately 3.3 million Wyeth shares.  The trading by the CR Intrinsic and SAC Capital portfolios in Wyeth securities constituted over 11% of the reported trading volume in the seven days prior to the July 29 Announcement.

86.     The following chart sets forth SAC Capital's holdings of Wyeth common stock and Elan ADRs and options on a quarterly basis through June 30, 2008, and on July 29, 2008, immediately prior to the July 29 Announcement:

| Description | Elan ADRs | Wyeth Stock |
|---|---|---|
| Equity Positions Before Trading Opened On July 21, 2008 | > 10.5 million shares | >7.1 million shares |
| Value of Equity Positions | >$365 million | >$335 million |
| Sales (Long and Short) between July 21 and July 29 | >15 million shares | >10.4 million shares |
| Total Sales Proceeds | >$500 million | >$460 million |
| Short Position Held Prior to July 29 Announcement | 4.5 million shares | 3.3 million shares |
| Percentage of Marketwide Sales Volume | >20% | >11% |

87.     CR Intrinsic and SAC Capital also placed options trades in Elan ADRs that bet on the ADR share price going down.  For example, on July 28 and July 29, the CR Intrinsic and SAC Capital portfolios purchased over $1 million worth of Elan put options with strike prices below the Elan ADR share price on those trading days.

**F.     Elan Discloses the Adverse Clinical Trial Results**

88.     On July 29, 2008, after the close of U.S. securities markets, Gilman presented the results of the Phase II trial at ICAD, and Elan and Wyeth issued a press release summarizing the results.  The detailed safety and efficacy results of the Phase II clinical trial were strongly and unexpectedly negative.  Not surprisingly, the findings did not go over well with analysts or the market.  A PiperJaffray analyst report on Elan issued the day after presentation of the Phase II

results, for example, removed bapi sales from its model and lowered its price target to $15 from $25, concluding that the "Phase II bapineuzumab data fall short of expectations" and "[b]ased on data presented (and omitted), we are more doubtful than optimistic regarding bapineuzumab's prospects." Similarly, Brean Murray Carret & Co. noted that the "[i]mbalance, lack of dose response, and post hoc analysis keep us suspicious of the drug efficacy," cautioned that "the new data should dramatically decrease Elan's market value," and reiterated its "sell" rating.

89.     On July 30, 2008, the first trading day after the July 29 Announcement, Elan's share price fell from $33.75 (the closing price on the day of the announcement) to $19.63 (the closing price on the day after the announcement), a decline of approximately 42%. Wyeth's stock price fell from $45.11 (the closing price on the day of the announcement) to $39.74 (the closing price the day after the announcement), a decrease of approximately 12%.

### G.     Defendants' Profits from Their Insider Trading Conspiracy

90.     As a result of the trades that were entered into during the period between Martoma's conversation with Gilman on July 17, 2008 and the July 29 Announcement, CR Intrinsic and SAC Capital portfolios in which Martoma and Cohen had trading authority achieved profits and avoided losses of over $276 million as follows:

| Description | Elan | Wyeth |
|---|---|---|
| Profits from Short Sales | $59.2 million | $16 million |
| Profits from Option Trades | $5.1 million | N/A |
| Losses Avoided | $154.2 million | $40.4 million |
| Total Unlawful Gain | $218.5 million | $56.4 million |

91.     Following certain allocations made after the July 29 Announcement, the profits and avoided losses were distributed roughly evenly between the CR Intrinsic portfolios, which reaped profits and avoided losses of approximately $138 million, and the SAC Capital portfolios, which reaped profits and avoided losses of approximately $137 million.

92.     At the end of 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain SAC LP portfolios.

93.     Gilman received over $100,000 from GLG for his consultations with Martoma and others at SAC Capital.

## CONTEMPORANEOUS PURCHASES AND SALES

94.     Plaintiff purchased Wyeth common stock common stock contemporaneously (within the meaning of Section 20A and 10(b) of the Exchange Act, 15 U.S.C. §78t-1 and 78j(b)), with the SAC Defendants' long and short sales of Wyeth common stock.

## LOSS CAUSATION

95.     The Defendants traded while in possession of material, nonpublic information. Later, when the Inside Information became publicly known, the price of Wyeth common stock declined sharply as a result of such disclosure.

96.     As a result of their purchases of Wyeth common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Wyeth common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

98.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Wyeth common stock was actively traded on the NYSE and over 1,331,176,822 shares were then outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pfizer (Wyeth's successor) or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as complained of herein.

100.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Gilman supplied the Inside Information to Martoma and SAC Capital, and whether SAC Capital traded Wyeth common stock while in possession of material, nonpublic information concerning Wyeth;

(c)    whether the Control Defendants exercised control within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), and whether such defendants are entitled to assert the defense of good faith;

(d)    whether the Inside Information was material; and

(e)    the amount by which Plaintiff was damaged and Defendants profited and avoided losses as a result of the securities law violations alleged herein.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

103.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants failed to disclose and/or traded on material, nonpublic information during the Class Period;

(b)    the omissions were material;

(c)    Wyeth securities traded in an efficient market;

(d)    Wyeth common stock was liquid and traded with moderate to heavy volume during the Class Period;

(e)    Wyeth common stock traded on the NYSE; and

(f)     Plaintiff and other members of the Class purchased and/or sold the applicable Wyeth securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

104.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    The information provided by Gilman to Martoma concerning the Phase II Trial was, in each case, material and nonpublic.  In addition, the information was, in each case, considered confidential by Wyeth, the SMC and Elan, which were the sources of the information.

107.    Gilman provided the Inside Information to Martoma in breach of the duty of confidentiality arising from the fiduciary relationship or similar relationship of trust and confidence that Gilman owed to Elan, Wyeth, and the SMC, and did so with the expectation of receiving – and did receive – a benefit.

108.    Martoma knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty or obligation, arising from a similar relationship of trust and confidence, to keep the Inside Information confidential.

109.    Martoma provided the Inside Information that he received from Gilman to the other Defendants named herein and other persons employed by SAC Capital with the expectation of a

benefit from doing so, and he and they knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

110.    The Defendants are jointly and severally liable for the trading of the CR Intrinsic funds and all the related SAC Capital funds because they each directly or indirectly effectuated the trades on behalf of the funds and/or unlawfully disclosed the material nonpublic information to the funds.

111.    By virtue of the foregoing, all Defendants and each of them, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

112.    By virtue of the foregoing, all Defendants, and each of them, violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 there under [17 C.F.R. §240.10b-5].

### SECOND CLAIM
### For Violations of Section 20A of the Exchange Act
### (Against All Defendants)

113.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

114.    This Claim is brought against all Defendants under Section 20A of the Exchange Act, 15 U.S.C. §78t-1.

115.    The information provided by Gilman to Martoma concerning the Phase II trials was, in each case, material and nonpublic.  In addition, the information was, in each case, considered confidential by Elan, Wyeth, and the SMC.

116.    Gilman provided the Inside Information to Martoma in breach of the fiduciary duty that Gilman owed to Elan, Wyeth, and the SMC, and did so with the expectation of receiving – and did receive – a benefit therefrom.

117.    Martoma knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Inside Information confidential.

118.    Martoma provided the Inside Information that he received from Gilman to the other Defendants named herein and other persons employed by SAC Capital with the expectation of a benefit from doing so, and he and they knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

119.    By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

120.    Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

121.    Plaintiffs contemporaneously purchased and/or sold securities of the same class as those sold and/or purchased by the Defendants.

122.    By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiff and the Class for the SAC Insider Sales pursuant to Section 20A of the Exchange Act, 15 U.S.C. §78t-1.

### THIRD CLAIM
#### For Violations of Section 20(a) of the Exchange Act
#### (Against the Control Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained in the foregoing as if fully set forth herein.

124.    This Claim is brought against SAC Capital Advisors, CR Intrinsic, and Cohen for control person liability under Section 20(a) of the Exchange Act.

125.    Pursuant to Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

126.    Each of the Control Defendants controlled Martoma by virtue of their function or status and each of the Control Defendants in fact exercised control over Martoma in connection with the SAC Insider Trades.

127.    The Control Defendants did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by: (i) permitting the SAC Insider Trades to occur with actual knowledge or reckless disregard for whether the persons trading on behalf of

the Fund possessed material, nonpublic information; or (ii) failing to adequately supervise Martoma in connection with his acquisition of the Inside Information and trading thereon.

128.    By virtue of the foregoing, the Control Defendants are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiff and the Class with the Defendants liable under the First and Second Claims above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  New York, New York
        April 12, 2013

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

By: _____
    Donald A. Broggi (DB-9661)
    Joseph P. Guglielmo (JG-2447)

The Chrysler Building
405 Lexington Avenue
40th Floor

New York, NY 10174-4099
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
    dbroggi@scott-scott.com
    jguglielmo@scott-scott.com

David R. Scott (DS8053)
**SCOTT+SCOTT, ATTORNEYS AT LAW,**
   **LLP**
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
    david.scott@scott-scott.com

*Attorneys for Plaintiff and*
*the Proposed Class*