```
           UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
           ------------------------------x

           BIRMINGHAM RETIREMENT and
           RELIEF SYSTEM

                        Plaintiff

                   v.                              13 Civ. 2459 (JGK)
                                                   Settlement
           S.A.C. CAPITAL ADVISORS L.P.,
           et al.

                        Defendants

           ------------------------------x
                                                   New York, N.Y.
                                                   September 30, 2016
                                                   2:30 p.m.
           Before:

                           HON. JOHN G. KOELTL

                                          District Judge

                                APPEARANCES

           SCOTT & SCOTT LLP
                Attorneys for Plaintiffs
           MAX R. SCHWARTZ
           DEBORAH CLARK-WEINTRAUB

           MOTLEY RICE LLC
                Attorney for Plaintiffs
           MEREDITH B. MILLER

           PAUL WEISS RIFKIND WHARTON & GARRISON
                Attorneys for Defendant SAC Capital
           DANIEL J. KRAMER
           GEOFFREY R. CHEPIGA
           AUDRA J. SOLOWAY

           GOODWIN PROCTER
                Attorneys for Defendant Martoma
           DANIEL P. ROESER
           TING TING TAM
```

1            (In open court; case called)
2            THE DEPUTY CLERK:  Would all parties please state who
3   they are for the record.
4            MR. SCHWARTZ:  Good afternoon, your Honor.  Max
5   Schwartz with Scott & Scott for plaintiffs.
6            MS. CLARK-WEINTRAUB:  Good afternoon, Your Honor.
7   Deborah Clark-Weintraub, also from Scott & Scott for the
8   plaintiffs.
9            MS. MILLER:  Good afternoon, Your Honor.  Meredith
10  Miller from Motley Rice on behalf of the plaintiffs.
11           MR. KRAMER:  Your Honor, for the SAC defendants,
12  Daniel Kramer from Paul Weiss.
13           MR. CHEPIGA:  Jeff Chepiga from Paul Weiss also for
14  the SAC defendants.
15           MS. SOLOWAY:  Audra Soloway also from Paul Weiss for
16  the SAC defendants.
17           MR. ROESER:  Good afternoon, your Honor.  Daniel
18  Roeser from Goodwin Procter for Mathew Martoma.
19           MS. TAM:  Ting Ting Tam also from Goodwin Procter for
20  Mr. Martoma.
21           THE COURT:  This is a hearing on the final approval of
22  the settlement in the Birmingham case and the approval of an
23  application for attorneys' fees and approval of the plan of
24  allocation.
25           MR. SCHWARTZ:  With permission, your Honor, I'll

1     approach the podium.

2         We are here today, your Honor, on the proposed
3     $10 million settlement in this action, which, as I will
4     explain, is a very strong recovery.  It represents about
5     50 percent of what we have determined are the recoverable
6     damages, and it came after extremely complex and hard-fought
7     litigation against premier firms in the country, Paul Weiss,
8     and it eliminates the risks and uncertainties of further
9     litigation.

10        Importantly, at the time that this settlement was
11    entered into, the parties had already advanced the case through
12    discovery, motions to dismiss and partway through class
13    certification so the parties had a strong understanding of the
14    strengths and weaknesses of the claims and were able to assess
15    that in comparison to the benefit that this settlement provides
16    the class now.

17        THE COURT:  It was clear to me that plaintiff had
18    reviewed a substantial amount of discovery, including discovery
19    that was provided to the SEC, the plaintiffs were deposed, the
20    plaintiffs issued discovery requests to the defendants.  It
21    wasn't clear to me whether the plaintiffs had conducted
22    depositions of any representatives of the defendants or third
23    parties.

24        MR. SCHWARTZ:  At the time the settlement was entered
25    into, we had, along with the plaintiffs in the Kaplan case, had

1    noticed, I believe, eight or so depositions of current or

2    former SAC employees and related parties, and we were preparing

3    for these depositions when the settlement occurred.

4             THE COURT:  Thank you.

5             MR. SCHWARTZ:  As I was about to say, your Honor, this

6    settlement is also supported by sophisticated institutional

7    lead plaintiffs and was entered into through arm's-length

8    negotiations assisted by the mediation of former Judge Lane

9    Phillips, a very highly respected mediator.  Under those

10   circumstances, the Second Circuit has held that settlements are

11   presumptively fair.

12            On top of that, perhaps the most important factor here

13   is that it has been overwhelmingly supported by the class.  The

14   deadline for filing objections and exclusions has passed, and

15   we only have one objection, which, as I will explain, was on

16   procedural grounds, and only four exclusions.

17            So, for all of these reasons, we respectfully submit

18   that this was an excellent settlement.  With your permission,

19   I'd like to run through the nine Grinnell factors, if you would

20   like.  I could also move on

21            THE COURT:  If you want, it's OK.

22            MR. SCHWARTZ:  Well, I have essentially summed them up

23   already in my introduction.  Perhaps I will just note that

24   there were real risks to proceeding with trial here.

25   Defendants had vigorously asserted that it would be very

```
 1   difficult for us to establish damages in either of the insider
 2   trading periods at issue.  The latter period which runs from
 3   July 21, 2008 to July 29, 2008 is what we refer to as the
 4   buying period because that is when the investors were
 5   purchasing shares of Wyeth, and as your Honor may be aware,
 6   there was a fair fund settlement with the SEC --
 7           THE COURT:  I couldn't have reviewed the papers and
 8   not be aware of that and the substantial difficulty posed by
 9   the disgorgement order which would be subtracted from --
10           MR. SCHWARTZ:  Correct.
11           THE COURT:   -- your potential damages.
12           MR. SCHWARTZ:  Correct.  It would arguably eliminate
13   all of the out-of-pocket damages, and in order to increase
14   those damages, we would have to rely on theories of prejudgment
15   interest that Mr. Kramer at last week's hearing flagged for
16   you, even if they are quite contentious, and defendants have
17   hotly contested those issues.  So, without getting into the
18   details, it would be, we believe, a real risk to increase
19   damages.
20           In terms of the earlier class period, which in this
21   case runs from January 14, 2008 through July 18, 2008, and this
22   is when the investors were selling Wyeth's shares, defendants
23   have argued that that entire claim should be dismissed based on
24   impermissible double counting of paper gains, and they also
25   have a variety of arguments about why the damages should be
```

1    reduced, not to mention that to begin with, the damages there
2    even our experts have found are only $21 million.
3         So, again, we think that when you look at what is
4    recoverable damages, not including potential prejudgment
5    interest theories, you're talking about $21 million here.
6    $10 million represents about 50 percent of that.  And compared
7    to many other settlements in this district and in securities
8    cases, a 50 percent or close thereto recovery is an excellent
9    outcome.  They're often significantly lower, both when the
10   damages ranges are in this range and higher.
11        I will just also quickly note that that one objection
12   we received, the objector argued that defendants had possession
13   of the trading records from 2008; that is, investors' trading
14   records, and this particularly investor apparently no longer
15   had his trading records and so felt that defendant should have
16   to supply them and he should not supply them himself.  That is
17   wrong both as a matter of fact and of law.  As a matter of
18   fact, defendants do not have individual investors trading
19   records; and as a matter of law, it's common practice for
20   claims administrators to actually have to see claimants'
21   transactions to prove exactly when and what they purchased.
22        Unless you have any other questions, your Honor, I can
23   move on to class certification.
24        THE COURT:  No, but you touch on one issue.  Are there
25   any objectors to the settlement who are present in court?

1     MR. SCHWARTZ:  I don't believe so, and none made a
2  notice of appearance.
3     THE COURT:  No.  I checked the docket sheet yesterday
4  and didn't find any additions.
5     MR. SCHWARTZ:  OK.  So moving on to the certification
6  of the proposed settlement class, as I believe your Honor is
7  aware, this case was obviously preliminarily approved by Judge
8  Marrero for certification; and on top of that, Judge Marrero
9  certified the actual litigation class in the Kaplan case.  So
10 there is very strong support for certifying this class here.
11     I can go through them in greater detail, but the Rule
12 23(a) factors are all satisfied.  There are thousands of
13 members to this class; common issues such as what the measure
14 of damages should be; plaintiff's claims are typical of the
15 other class members; they all flow from the same alleged
16 misconduct on behalf of defendants; and the lead plaintiffs are
17 adequate representatives, large institutions who selected
18 well-qualified counsel and had every incentive to maximize the
19 recovery.
20     With respect to Rule 23(b), that requirement is often
21 relaxed in the context of settlements, but even in litigation
22 it's commonly found to be satisfied in securities matters; and
23 what that factor really focuses on for our purposes is the
24 cohesion of the class.  And, again, for all the reasons I just
25 quickly recited, this is a cohesive class that merits

1   certification, and it would be far superior to adjudicate these
2   claims on a class basis than individually.
3           So absent any other questions, I'll move on to the
4   plan of allocation.
5           THE COURT:  By the way, you all had submitted to me a
6   proposed final judgment which was updated which included as an
7   Exhibit A, the four opt-outs:  Mr. Thompson, Ms. Winter,
8   Ms. Flowers, and Delbert and Lorraine Murray, but I didn't see
9   an order for the plan of allocation and for the attorneys'
10  fees.
11          MR. SCHWARTZ:  I have copies of those here, your
12  Honor.  May I approach the bench?
13          THE COURT:  Yes.  Would you pass them up to my clerk.
14          MR. SCHWARTZ:  There are two copies of each.
15          THE COURT:  Go ahead.
16          By the way, you forgot to change the judge both in the
17  caption and in the signature line.
18          MR. SCHWARTZ:  I apologize, your Honor.  I printed
19  them off of the docket.
20          THE COURT:  I can do that.  Go ahead.
21          MR. SCHWARTZ:  So, moving on to the plan of
22  allocation, the same standard applies here as to the entire
23  settlement as a whole, and the question is whether the plan is
24  fair and adequate.  The plan is quite detailed, so what I'd
25  like to do is just summarize the highlights; and if you have

any questions, I am, of course, happy to elaborate.

The goal of this plan is to equitably distribute the settlement proceeds among claimants on a pro rata basis, and that is taking into the account the SAC defendants' alleged elicit gains during the insider trading periods as well as the fair fund distribution.

So the first step is to identify who an authorized claimant is, and the key question here is, of course, whether an investor traded opposite SAC. So, in the selling period, the question is whether a claimant was a net seller and also sold contemporaneously to the time when SAC was buying, and then the opposite is true for the buying period. Ultimately, when this calculation is completed, what we have is a number of damaged shares for any potential claimant in the buying period and the selling period.

The next step is to ascribe a damages amount to each of those shares. The way we calculated that is by looking at the alleged illicit gains during each relevant period, and when our damages consultant who came up with this plan of allocation analyzed SAC's trades during each period and determined what those gains were, and he came up with one number for the selling period, and he came up with two different numbers for the buying period, which is the longer period; and that's because 91 percent of the alleged illicit gains in the selling period took place between January 14 and June 17. So we

1  ascribe the bulk of the damages in direct proportion to that
2  91 percent to that earlier phase of the selling period.  So
3  when you combine those two steps for each claimant, we're able
4  to determine the amount of recognized losses on each of their
5  net shares sold during the selling period and are bought during
6  the buying period.
7          Finally, because of the SEC fair fund distribution
8  that claimants here will be eligible to participate in, we
9  allocate 90 percent of the funds for distribution to the
10 insider -- pardon me -- to the selling period and 10 percent to
11 the buying period.  Then the last step, of course, is the pro
12 rata distribution.  This plan was fully disclosed, and there
13 have been no objections, so we submit that it is fair and
14 reasonable.
15         If your Honor has any questions, I can address them.
16         THE COURT:  No.
17         MR. SCHWARTZ:  OK.  Finally, I'd like to address the
18 fees and expenses.
19         THE COURT:  I think we should address first the
20 approval of the settlement and a plan of allocation before we
21 get to attorneys' fees.
22         MR. SCHWARTZ:  OK.
23         THE COURT:  So let me listen to anyone else with
24 respect to the first two issues.
25         MR. KRAMER:  Your Honor, Dan Kramer for the SAC

1    defendants.  We've got nothing to add to those issues.
2            THE COURT:  OK.  Well, I've studied the papers, and
3    it's plain that the settlement is fair, reasonable and
4    adequate.  The plan is procedurally fair.  The settlement is
5    procedurally fair.  It was arrived at through arm's-length
6    negotiation by experienced lawyers on both sides with the
7    assistance of a distinguished third-party mediator, a retired
8    judge.  The plan is the settlement.  There is no reason to
9    believe that there was any bad faith or collusion in the
10   settlement.
11           Substantively, the Grinnell factors were certainly
12   satisfied.  Proceeding with the litigation would have been
13   complex, and there were significant issues with respect to
14   damages, particularly in light of disgorgement in the SEC case.
15           The reaction by the class is very important and very
16   significant despite over 300,000 individual notices being sent
17   out and wide publicity, there was only one objection and four
18   opt-outs.  The class plainly included sophisticated investors
19   who were fully informed of the details of the settlement and
20   who did not object or opt out. With respect to the one
21   objection, the objection was not based on the substance of the
22   settlement but on a procedural issue as to whether investors
23   should be required to produce records of their investments.
24   One investor objected because the investment was made some
25   years ago, and he had severed his relationship with his

1    brokerage firm.
2             I will overrule that objection.  It is appropriate for
3    those who seek to participate in the settlement to provide
4    records of their investments so that they can participate in
5    the settlement, and it is not a fair objection that the
6    individual investor had since severed his ties to that
7    brokerage firm.  Certainly, he could have sought records from
8    the brokerage firm for the period when he was a client.  So, I
9    overrule that objection.
10            Continuing with why the settlement was fair,
11   reasonable and adequate, very important is the estimate of what
12   the recovery is for the settlement class compared to what the
13   class could have obtained after further complex litigation,
14   after a trial, and after the potential appeal.  There is no
15   dispute that the settlement is by the plaintiff's standards
16   approximately 50 percent of the reasonable amount that the
17   plaintiff could have obtained after much more discovery and
18   uncertainty as to the amount that the plaintiffs could actually
19   recover.  That is a substantial percentage of recovery for
20   settlement.  So it's plain that the settlement should be
21   approved.
22            It is also plain that the class meets all of the
23   necessary standards under Rule 23 and should be certified for
24   purposes of settlement.  It is also clear that the plan of
25   allocation which was disclosed in the public notices, and as to

1    which there has been no objection, is a thoroughly reasonable
2    plan of allocation.  So, I realize that the final judgment
3    makes additional findings, including the fact that notice to
4    the class was adequate under Rule 23, best notice practicable
5    under the circumstances consistent with due process, and I will
6    sign the judgment except I note that the judgment is
7    September 30, 2016.  I will sign the plan of allocation.  In
8    approving the plan of allocation, I note that the matter came
9    on before the Court on September 30, 2016.
10             Any other changes that should be made in either of the
11   proposed final judgment or the plan of allocation?
12             MR. SCHWARTZ:  Not that I'm aware of, your Honor.
13             THE COURT:  Defendant?
14             MR. KRAMER:  No, your Honor.
15             THE COURT:  OK.  Attorney's fees.
16             MR. SCHWARTZ:  Plaintiff's counsel has requested a fee
17   of 30 percent of the settlement fund, which in dollar terms is
18   $3 million.  Here too 50 percentage was fully disclosed in the
19   notice, and there have been no objections.  We respectfully
20   submit, your Honor, that this request is reasonable and
21   justified under both the percentage of the fee method and the
22   lodestar cross-check.
23             The plaintiff's counsel devoted approximately 8,100
24   hours to this litigation, and that was over the course of three
25   years.  I highlighted some of the work that we performed

1   earlier, but to give a little more detail, we assisted in the
2   preparation of multiple complaints, the last of which was
3   approximately 200 pages long and went into extensive detail
4   into the various matters alleged with regard to SAC's alleged
5   insider trading.  We assisted in motions to obtain premotions
6   to dismiss discovery.  We opposed two motions to dismiss class
7   certification, reviewed millions of documents, again assisting
8   in various procedures, and also went through the extensive
9   negotiation mediation with defendants.  All of this was work
10  that was necessary to obtain, again, what we believe is a very
11  strong recovery.
12           In terms of the percentage of the fee method, the
13  30 percent request comports favorably to similar requests in
14  this district, and that includes for cases that were in this
15  settlement range.  We've listed several such cases in our
16  moving papers.  In terms of the lodestar cross-check --
17           THE COURT:  There are cases with smaller percentages.
18           MR. SCHWARTZ:  That's true, your Honor.
19  And for the reasons set forth, we think that this is reasonable
20  and --
21           THE COURT:  I'm sorry.
22           MR. SCHWARTZ:  That is correct, your Honor, and
23  perhaps when I go through the lodestar cross-check, I can
24  explain why we think our request is reasonable here.
25           The approximately 8,100 hours that were billed comes

1    to a lodestar of about $4,400,000.  That would represent a
2    negative multiplier of point 68.  By comparison, courts
3    frequently regard positive multipliers, and that can range as
4    high as a three or four.  So when you take the excellent
5    result --
6             THE COURT:  I don't think I've ever approved a
7    multiplier that high.
8             MR. SCHWARTZ:  That may very well be possible, your
9    Honor, and I hadn't said that you did, but certainly we have
10   found cases where that occurred.  The point is simply that --
11            THE COURT:  But this doesn't have a multiplier
12   anything like that.
13            MR. SCHWARTZ:  That's all I was trying to get across.
14            And when you take the negative multiplier with the
15   excellent result and the amount of work involved, we believe
16   this fee is fully justified.
17            Again, the Goldberger factors, which overlap to a
18   large extent with the Grinnell factors for the support, if you
19   request, I can go through them in detail if you like.  The
20   factors are the complexity of the litigation, the size of the
21   of the recovery, the litigation risks involved, quality of
22   counsel and opposing counsel.  As I discussed earlier, there
23   was a substantial risk that there would never be any fee paid
24   here because it was an extremely difficult case involving some
25   malleable theories, both in terms of substance and damages, and

```
 1   plaintiff's counsel assisted in bringing this case a very long
 2   way to the point we are here where we have recovered almost
 3   50 percent of the damages.
 4            So, unless your Honor has any questions, I would move
 5   on to the expenses.
 6            THE COURT:  No.  I have no questions.
 7            MR. SCHWARTZ:  We have requested here $297,779.08.
 8            THE COURT:  $297,779.08.
 9            MR. SCHWARTZ:  Correct, which is less than --
10            THE COURT:  Less than the 350,000 that you gave notice
11   to the class, as to which there was no objection.
12            MR. SCHWARTZ:  Correct.  And all of these expenses
13   were for necessary tasks furthering litigation, the bulk of
14   which were electronic discovery and production, mediation.
15   There is also a little bit of travel.  So, again, we believe
16   these were all necessary costs, and, of course, which we have
17   paid out of pocket and have not been reimbursed for as to date.
18            Finally, as I believe your Honor is aware, we also
19   believe each lead plaintiffs has requested --
20            THE COURT:  $5,000 for each of the plaintiffs.
21            MR. SCHWARTZ:  Exactly.  Their declarations set forth
22   the extensive work they performed, and, again, they actually
23   performed more than the $5,000 than they are requesting, so we
24   believe since there are no objections to that either, that that
25   request should be granted as well.
```

1           That's all I have, your Honor, but I'm happy to answer
2  any questions.
3           THE COURT:  No.  Thank you.
4           Does anyone want to be heard further on the issue of
5  attorneys' fees?
6           MR. KRAMER:  No, your Honor.  Thank you.
7           THE COURT:  OK.  Thank you.  The request for
8  attorneys' fees is a reasonable request.  Taking all of the
9  factors appropriately taken into account, the total amount of
10 attorneys' fees in the amount of $3 million or 30 percent of
11 the recovery is reasonable.  I appreciate that some courts use
12 the percentage of recovery.  30 percent is on the high side.
13 Some use one-third.  On the other hand, the lodestar in this
14 case is substantially more than the recovery of $3 million.
15 It's plain a lot of reasonable time and effort went into
16 pursuing this case on a contingent basis and that the recovery
17 was a substantial recovery and was a good result for the class.
18 An effectively negative multiplier of point 68 reflects that
19 the total fee that's being sought is in fact a reasonable fee.
20 The hours expended were reasonable.  The hourly rates by Scott
21 & Scott were reasonable.  Motley Rice's rates were high, but
22 there is a substantial negative multiplier.  So taking all of
23 that into account, a $3 million fee or 30 percent of the
24 recovery is reasonable.
25          Expenses in the amount of $297,779.08 is reasonable.

G9UQBIRc

1    Another indication of reasonableness is the fact that the total
2    amount of the fees was publicly disclosed and there were no
3    objections, and the two institutional investors who are the
4    named plaintiffs both attest that the fee is reasonable.  The
5    fees to the two institutional investors are reasonable given
6    the amount of time that they spent, and their responsibilities
7    in the case.
8              I am not sure that all of the recitations supporting
9    the attorney's fee award are necessary, but there is no reason
10   that they shouldn't go in with two exceptions.  In paragraph G,
11   I will put the semicolon after "As set forth in the motion,
12   Wyeth lead counsel devoted over 8,141.35 hours of prosecution
13   to the action.  I don't like signing orders which then go into
14   firm resumés.  And, similarly, paragraph J, "Wyeth lead
15   plaintiffs fulfilled their obligations as representatives." If
16   I've missed any other pans here, could you point them out to
17   me?  It wasn't as bad as it sometimes is.
18             MR. SCHWARTZ:  We were in front of you once before and
19   we tried to eliminate all pans, your Honor.  I have given you
20   both of my copies by accident.  I can go through them very
21   quick if you'd like.
22             (Pause)
23             THE COURT:  And it doesn't have the statements about
24   sophisticated and diligence of defense counsel either, right?
25             MR. SCHWARTZ:  I would never accuse them of that, your

1   Honor.
2              THE COURT:  It was part of your brief in support of
3   the motion about how it took an unusual amount of skill because
4   of the skill of the defense counsel.
5              MR. SCHWARTZ:  Forgive my attempt at humor.  I can
6   assure you that they deserve their reputation.
7              THE COURT:  OK.  Well, I've made those changes, and I
8   will sign the attorney's fee order.
9              OK.  Anything else?
10             MR. SCHWARTZ:  No, your Honor.
11             MR. KRAMER:  No, your Honor.  Thank you.
12             THE COURT:  OK.  Good afternoon all.
13             (Adjourned)